755 F.2d 421
 Bankr. L. Rep. P 70,327
In the Matter of PASO DEL NORTE OIL CO., and its alter ego
Texas Energy Co., Inc. of El Paso, Bankrupt.
Joel G. URANGA, Plaintiff-Appellee,
v.
R. Ben GEIB, Defendant-Appellant.
 No. 84-1283.
 United States Court of Appeals,
Fifth Circuit.
 March 18, 1985.
 
 Sheinfeld, Maley & Kay, George H. Tarpley, Houston, Tex., for defendant-appellant.
 Collins, Langford & Pine, John A. Langford, El Paso, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Texas.
 Before REAVLEY, TATE, and HILL, Circuit Judges.
 ROBERT MADDEN HILL, Circuit Judge:
 
 
 1
 In the United States Bankruptcy Court, Joel Uranga proceeded against R. Ben Geib, alleging that Geib, through his partner O.E. Collier, fraudulently induced Uranga to convey stock in Paso Del Norte Oil Company (Paso). The bankruptcy court's judgment in favor of Uranga was affirmed by the district court. Geib appeals. Since the bankruptcy court was without jurisdiction to resolve the controversy between Uranga and Geib, we conclude that this action must be dismissed.
 
 I.
 
 2
 Until 1978 Uranga owned a portion of the stock of Paso, a supplier of refined petroleum products. Title to the remainder of the stock was held by certain trusts of which Uranga was trustee. Early in 1978, with Paso beginning to experience financial difficulty, Uranga began searching for prospective buyers of Paso. In mid-1978 Uranga was approached by Geib and his partner Collier. Sale to Geib and Collier of fifty-one percent of the stock followed and Geib and Collier assumed full control of the company's affairs.
 
 
 3
 Soon thereafter, on June 19, Collier presented Uranga and his wife with a draft agreement for the sale of Uranga's remaining forty-nine percent interest to Geib and Collier. After a lengthy discussion in which Collier represented to the Urangas that the sale and consequent divorce of Uranga's name from the business was necessary to salvage the company and regain a viable relationship with creditors, the Urangas signed the agreement. Uranga alleges that Collier also promised that the transaction would be nullified, and the stock returned, within ninety days--after the salutary effects of the transaction had been garnered. This promise, however, was not reduced to writing.
 
 
 4
 In November 1978 Paso entered bankruptcy proceedings under chapter XI of the Bankruptcy Act of 1898 (the Act). 11 U.S.C.A. Sec. 1 et seq. (1966). In January 1980 a Plan of Arrangement (the Plan) was filed which proposed the classification and settlement of Paso's debts and the conveyance of the company to James L. Ikard. The conveyance was to be accomplished by the outright sale of 10% of the stock to Ikard from Geib and the redemption by the company itself of the other 90% held by Geib.[1]
 
 
 5
 On January 29, Uranga filed an objection to the Plan contending he was entitled to a forty-nine percent ownership in the debtor company. The next day two important events took place. First, the Plan was confirmed by the bankruptcy court and all of Paso's assets were restored to its possession free of all claims, liens and encumbrances. See 11 U.S.C.A. Sec. 110(i) (1953). However, pursuant to Sec. 369 of the Act, 11 U.S.C.A. Sec. 769 (1970), the court retained jurisdiction over the claims affected by the Plan. The order confirming the Plan provided that the court would retain jurisdiction over the stock ownership dispute between Uranga and Geib. Second, a stipulation between Uranga, Geib, Ikard and Paso was filed with the bankruptcy court. The stipulation provided that the sale to Ikard of the Paso stock would proceed according to the Plan, that Uranga would make no claim to the stock thus sold, that Uranga and Geib would submit their dispute as to the ownership of the stock to the bankruptcy court for resolution at a later date, that Uranga would look solely to the proceeds of the redemption and sale to Ikard of Geib's stock for satisfaction of his claim, and that neither Ikard nor Paso would be made parties to proceedings involving the dispute.
 
 
 6
 On January 31, the sale to Ikard and the redemption were consummated by a resolution of Paso's board of directors. As consideration, Geib received $45,000 in cash and promissory notes for the remainder of the $248,400 purchase price agreed upon for the redemption and sale. The entire amount has since been paid to Geib.
 
 
 7
 After trial of the stock ownership dispute in September 1980, the bankruptcy court, based on its findings of fact and conclusions of law, set aside the conveyance of Uranga's 49% interest and entered judgment in his favor for, in effect, 49% of the proceeds of the sale to Ikard. The district court, rejecting Geib's challenge to its jurisdiction, affirmed the bankruptcy court's judgment in a memorandum opinion and order.
 
 II.
 
 8
 The question presented is whether the bankruptcy court had jurisdiction to determine the legal effect of an agreement transferring approximately one half the stock of the debtor corporation, which agreement was executed and performed before the debtor entered bankruptcy.
 
 
 9
 Chapter XI of the Act established a statutory procedure for the voluntary reorganization of a debtor, which is accomplished by arranging its debts for relief to unsecured creditors.[2] Bankruptcy courts are courts of limited jurisdiction, however, "whose power to act must be found expressly or impliedly in the Bankruptcy Act." First State Bank and Trust Co. v. Sand Springs State Bank, 528 F.2d 350, 353 (10th Cir.1976). Various matters over which the bankruptcy courts have jurisdiction are set out in Sec. 2 of the Act. 11 U.S.C.A. Sec. 11. More to the point, the jurisdiction of the court is limited, in Sec. 311 of the Act, to the "debtor and his property, wherever located." 11 U.S.C.A. Sec. 711 (1970). Jurisdiction attaches, if at all, at the time the chapter XI petition is filed. Thummess v. Von Hoffman, 109 F.2d 291, 293 (3rd Cir.1940); McKesson & Robbins v. Morris Travis Drugs Co., 106 F.2d 681, 681 (6th Cir.1939). A court of bankruptcy has no power to entertain collateral disputes between third parties that do not involve the bankrupt or its property, see In re Shirley Duke Associates, 611 F.2d 15, 18 (2nd Cir.1979); First State Bank and Trust Co., 528 F.2d at 353-54, nor may it exercise jurisdiction over a private controversy which does not relate to matters pertaining to bankruptcy. Associated Electronic Supply Co. v. C.B.S. Electronic Sales Corp., 288 F.2d 683, 684 (8th Cir.1961).
 
 
 10
 The dispute between Uranga and Geib, who were third parties in relation to the Paso chapter XI proceeding, involved questions of common law fraud. The sole issue before the bankruptcy court was whether, under the law of Texas, Geib and Collier fraudulently induced Uranga to sell the remaining forty-nine percent of the Paso stock. Ownership of the debtor's stock as between third parties being the sole issue in dispute, the bankruptcy court lacked jurisdiction to resolve the dispute since neither the debtor nor its property was involved.
 
 
 11
 It is widely recognized, and we have previously held, that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders. In re Texas Consumer Finance Corp., 480 F.2d 1261, 1266 (5th Cir.1973); see also In re Journal-News Corp., 193 F.2d 492, 492 (2nd Cir.1951). In In re Texas Consumer Finance, we held that neither the debtor nor its property was involved in a controversy involving the obligation of a shareholder of the debtor corporation to submit its shares for cancellation where submission and cancellation were conditions precedent to the effectiveness of the plan of arrangement in the chapter XI proceeding. Consequently, the bankruptcy court had no jurisdiction to resolve the controversy. Though factually somewhat distinct from the Uranga-Geib dispute, the controversy in In re Texas Consumer Finance presented a stronger case for jurisdiction: if, as in In re Texas Consumer Finance, the bankruptcy court "has no jurisdiction to order or restrain disposal of [the debtor's] stock,"[3] when the disposal is provided for in the chapter XI plan and the plan depends for its effectiveness on the disposal, then, a fortiori, it could not have jurisdiction to determine the validity of a stock transfer which was consummated before the corporation was a debtor. Neither dispute concerns the debtor or its property.
 
 
 12
 Nor does it avail Uranga to argue that the right to the proceeds of the redemption and sale of stock, rather than ownership of the stock itself, is in issue. Jurisdiction of this purely collateral dispute was not conferred on the bankruptcy court by a mere stipulation to the effect that the claim was for proceeds derived from the debtor's assets by the redemption and not for the stock itself. Merely changing the form of the property held by Paso--from cash to treasury stock--and of the thing claimed by Uranga--from outstanding stock to cash--did not involve the property of Paso in the controversy between Uranga and Geib. At no time did Paso have a property interest in the proceeds, qua proceeds, and at no time did Uranga or Geib claim a property interest in Paso's assets: according to the stipulation Paso claimed no interest in the assets after they became "proceeds"[4] and Uranga claimed no interest in the stock after it became Paso's property. Thus, no claim was ever made against the debtor's property. In addition, the redemption took place and the "proceeds" were created only after the Plan had been confirmed and possession of Paso's property had been relinquished by the bankruptcy court. Bankruptcy courts lack jurisdiction over controversies not involving claims against the debtor or its property and controversies in which the bankrupt and its unsecured creditors have no interest. Nixon v. Michaels, 38 F.2d 420, 424 (8th Cir.1930); see also In re Burton Coal Co., 126 F.2d 447, 448 (7th Cir.1942); In re Lubliner & Trinz Theatres, 100 F.2d 646, 651 (7th Cir.1938).
 
 
 13
 We note that a bankruptcy court does have jurisdiction to resolve a dispute between third parties "if it is impossible to administer completely the estate of the bankrupt without determining the controversy." First State Bank & Trust Co., 528 F.2d at 353. Even if resolution of the controversy might have a "chilling effect" on the financing of the arrangement plan, see In re New York & Worcester Express, Inc., 294 F.Supp. 1163, 1165 (S.D.N.Y.1968), or might reduce claims against the debtor's estate, First State Bank & Trust Co., 528 F.2d at 353-54, exercising jurisdiction over a collateral controversy is improper where it is "possible" to administer the estate without resolving the controversy. Id.
 
 
 14
 Here, the stock ownership controversy had no effect, not even a minimal effect such as those noted above, on the administration of the estate.[5] Certainly, if Uranga had declined to agree, in the stipulation, to the stock sale to Ikard, he could not have prevented it except by a fraud action in the courts of the state of Texas. That the parties agreed to the transfer and stipulated to the bankruptcy court's jurisdiction could not change this result. Subject matter jurisdiction cannot be conferred upon the bankruptcy courts by consent of the parties. In re Texas Consumer Finance Co., 480 F.2d at 1266 (citing Nierbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167-68, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939)).[6]
 
 
 15
 Finally, we reiterate the fact that the dispute before us is founded solely on principles of state common law, not on the principles or policies that are embodied in the Act. "Bankruptcy courts should be reluctant to entertain questions which may be equally well resolved elsewhere." First State Bank & Trust Co., 528 F.2d at 354 (citing Rees v. Jensen, 170 F.2d 348, 351 n. 2 (9th Cir.1948)). As in First State Bank & Trust Co., the substantive questions presented here are most properly left to those best qualified to answer them: the courts of the state of Texas.[7]
 
 
 16
 Accordingly, the judgment below is reversed and this case is remanded for dismissal for want of jurisdiction.
 
 
 17
 REVERSED AND REMANDED.
 
 
 
 [1]
 At this time Geib owned all of the stock of Paso, having acquired all of Collier's interest
 
 
 [2]
 See S.E.C. v. United States Realty & Improvement Co., 310 U.S. 434, 452, 60 S.Ct. 1044, 1051, 84 L.Ed. 1293 (1940); see also id. at 446-453, 60 S.Ct. at 1048-1052 for a thorough discussion of the procedures provided by and the remedies available under chapter XI
 
 
 [3]
 In re Texas Consumer Finance, 480 F.2d at 1266
 
 
 [4]
 This is especially true since the actual funds used to redeem the stock originally came from outside the debtor's estate, i.e., from funds deposited in an escrow account by Ikard. If Uranga wishes to support his argument by tracing funds he must trace them to their true source. The redemption was merely a structural device employed to accomplish, in effect, a sale of all of Geib's stock to Ikard
 
 
 [5]
 Compare In re Burton Coal Co., 126 F.2d at 448, in which the Seventh Circuit held that jurisdiction existed to determine the value and ownership of the debtor's stock which secured the claim of one of the creditors and ownership of which was also claimed by third parties. The holding was premised on the understanding that "it was impossible to administer the estate, or reorganize the debtor, without determining the [stock] controversy" since one of the parties to the stock controversy was a creditor and "reorganization of the debtor [could] not be had without the approval of the creditors." Id. at 447-48. No such obstacle to reorganization existed in the case before us
 
 
 [6]
 Our holding in R.I.D.C. Indus. Dev. Fund v. Snyder, 539 F.2d 487 (5th Cir.1976), is not to the contrary. In Snyder the issue was not whether subject matter jurisdiction over an adversary proceeding was conferred by consent of the parties, but whether the court had jurisdiction to approve a plan of arrangement voluntarily participated in by a secured creditor. Observing that the secured creditor had voluntarily relinquished its security interest under the plan, we held in the affirmative and, to that extent, but only to that extent, modified the language in In re Texas Consumer Finance that stated, "[n]o provision of the Act permits an arrangement proposed under Chapter XI to deal with the rights of secured creditors or with the rights of stockholders." 480 F.2d at 1265 (emphasis added)
 
 
 [7]
 Under Texas law, the filing of an action that is dismissed, even by a federal court, for want of jurisdiction tolls the running of the applicable statute of limitations. Tex.Rev.Civ.Stat.Ann. art. 5539a (Vernon 1958); see Burford v. Sun Oil Co., 186 S.W.2d 306, 315 (Tex.Civ.App.--Austin 1944, writ ref'd. w.o.m.)